IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

KIMBERLY LARAY GRICE,

     Plaintiff,

v.                            No. 11-1363

JACKSON-MADISON COUNTY
GENERAL HOSPITAL DISTRICT aka
WEST TENNESSEE HEALTHCARE,

     Defendant.
_____

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
_____

     Plaintiff, Kimberly Grice, brought this action against Defendant, Jackson-Madison
County General Hospital District aka West Tennessee Healthcare ("WTH") on November 30,
2011 alleging racial discrimination, a hostile work environment, and retaliation in violation of
Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and the Tennessee Human Rights
Act, Tenn. Code Ann. § 4-21-101, *et seq*. Before the Court is Defendant's motion for summary
judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure to which Plaintiff has
responded and Defendant has replied to the response.

I.  STANDARD OF REVIEW

     Rule 56 provides that a court "shall grant summary judgment if the movant shows that
there is no genuine dispute as to any material fact and the movant is entitled to judgment as a
matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct.
2548, 2552, 91 L. Ed. 2d 265 (1986); Canderm Pharmacal, Ltd. v. Elder Pharm., Inc., 862 F.2d

597, 601 (6th Cir. 1988). A dispute about a material fact is genuine only if "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Once the moving party satisfies its initial burden, "the opposing party must go beyond the contents of its pleadings to set forth specific facts that indicate the existence of an issue to be litigated." Slusher v. Carson, 540 F.3d, 449, 453 (6th Cir. 2008). In reviewing a motion for summary judgment, the court must view the evidence "in the light most favorable to the nonmoving party, and draw all reasonable inferences in that party's favor." Smith v. Perkins Bd. of Educ., 708 F.3d 821, 825 (6th Cir. 2013) (quoting Slusher, 540 F.3d at 453); see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986). Thus, summary judgment is warranted, following discovery and proper motion, against a party who fails to make a sufficient showing to demonstrate the existence of an element essential to her case and on which she will bear the burden at trial. Celotex, 477 U.S. at 322–23, 106 S. Ct. at 2552.

## II.  FACTS

The facts construed in the light most favorable to the nonmoving party are as follows. Defendant is a hospital and governmental entity created by Chapter 686 of the Private Acts of the General Assembly of the State of Tennessee for 1949, as amended. (Docket Entry ("D.E.") 100-2 at 19.) Plaintiff is a black female who was employed as a clinical nurse manager on C8, an outpatient floor at WTH, beginning on or around January 2008. (D.E. 118 at ¶¶ 1, 3.) Richard Wood, a white male, served as nurse director of C8 from September 2007 to January 2010. (D.E. 100-2 at ¶3; D.E. 108-1 at ¶ 4.) Wood was Grice's immediate supervisor and reported to Steven Albright, a white male, who is the Administrative Director of the West Tennessee Heart and

Vascular Center and supervisor of the nursing directors. (D.E. 100-2 at ¶ 4; D.E 108-1 at ¶¶ 5, 65.) In both 2008 and 2009, Grice scored high marks on her employee evaluations conducted by Wood—both of which reflected scores of 5/5 for compliance with policies and showed overall scores of 91 and 92 (out of 100), respectively. (D.E. 108-1 at ¶¶ 1, 2.)

Wood left WTH in January 2010, at which point Debbie Harris, the then-Director of Recruitment and Retention, performed prescreening interviews for Wood's replacement with Plaintiff and other employees, including Renee Peebles, Brad Hatch, and Allison Meeks. (100-2 at ¶ 6; 100-2 at 148, ¶ 5.) However, a decision was made to delay filling the position, and Deborah Lewis and Kim Bailey Roberts, both acting directors of other floors, were appointed as interim co-directors of C8 beginning February 1, 2010. (D.E. 100-2 at ¶¶ 6, 7.) On Friday, January 29, 2010, a snowstorm hit the area and C8 was closed by WTH administrators for the weekend. (Id. at ¶ 9; D.E. 108-1 at ¶ 9.) WTH's policy regarding staffing on these occasions provided that

> [e]mployees are expected to make every effort to report to work during times of inclement weather, unless otherwise advised by their director. Staffing at sufficient levels must be accomplished on days of inclement weather as well as normal days. In the event that inclement weather begins while nursing staff is at work, directors, managers, supervisors or charge nurses will call Clinical Services before sending any nursing staff home before the end of their shift. Employees may not leave without permission of management. . . . In the event an employee absolutely cannot report to work, appropriate department call-in procedures must be followed.

(D.E. 109 at 3.)

As clinical manager, Grice was primarily responsible for ensuring C8 was adequately staffed at all times. (D.E. 100-2 at 36.) Although the floor was closed, nurses working on C8 were still required to report for duty to cover other areas of the hospital if needed. (Id.) Plaintiff

3

called all the C8 staff scheduled for the evening of January 29, and the remainder of the weekend, to inform them of the closure and their duty to report under hospital policy. (Id.) However, staff members expressed a general sentiment of reluctance to endure the weather just to potentially cover open areas of the hospital where other employees had called in. (Id. at 35–37.) Plaintiff was wary that the staff would not show up and relayed this concern to Roberts. (Id. at 35.) Feeling that she had done everything possible, Plaintiff left work on January 29 at 7:00 p.m., past her scheduled time, after checking with the staffing office and being informed she was not needed elsewhere, but before ensuring that the C8 employees had reported as scheduled for the night shift. (Id. at 37; D.E. 118 at ¶ 12.) She left the building with Wood, who was working his last day as her director. (D.E. 118 at ¶ 12.) All of the C8 staff eventually called in that evening and weekend citing the inclement weather and failed to report to work. (D.E. 100-2 at ¶ 16.)

Two other clinical nurse managers, Anita Moss and Sally Burrow, whose floors were not closed, stayed beyond their scheduled time to ensure the staffing needs of their floors were met. (D.E. 100-2 at ¶¶ 13, 14.) When Plaintiff returned to WTH on February 1, she met with Roberts, Lewis, and Harris regarding the staff call-ins and was informed that they were looking into the matter and would be speaking to staff one-on-one. (Id. at ¶¶ 18, 19). In these individual meetings, the staff expressed concerns of inconsistent treatment by Grice and relief that she not been appointed interim director. (Id. at ¶ 20.) Plaintiff was ultimately held responsible, but at least at this time not formally disciplined, for failing to ensure C8 was adequately staffed that weekend. (D.E. 108-1 at ¶ 16.)

On February 5, 2010, Lewis sent Plaintiff an email instructing her to report to the staffing office at 6:45 a.m. on Monday, February 8 to work as a staff nurse if C8 remained closed. (D.E. 100-2 at 43.) Grice says she did not receive the email before leaving Friday, and therefore did not arrive by 6:45 a.m. on Monday. (Id.) That same day, Steve Albright and Debbie Harris met with Grice expressing concerns about her leadership and performance. (Id. at ¶ 28.) Albright informed Grice that Lewis and Roberts would be meeting with her to discuss a corrective action plan and that, effective the next day, she should report to the staffing office at 6:45 a.m. while C8 was closed. (D.E. 108-1 at ¶ 17; D.E. 100-2 at ¶ 29.) Lewis and Roberts went through the corrective action plan form with Plaintiff to discuss her employment expectations and responsibilities. (D.E. 100-2 at ¶ 30.) This was not considered a formal reprimand at the time, but was referenced as a disciplinary action in a later reprimand. (Id.; D.E. 108-1 at ¶ 23.)

On February 10, 2010, Plaintiff was given a formal written reprimand by Roberts and Lewis for misrepresenting certain facts to them. (D.E. 100-2 at ¶ 33.) Grice had stated to her directors that she had permission to work and receive training in another part of the hospital while C8 was still closed, although she had not yet had explicit permission to do so. (Id.) This reprimand stated that further violations of performance expectations or procedures could result in progressive discipline up to and including demotion and termination. (Id.) Grice filed a grievance contesting the action and asserting that the incident was just a miscommunication. (D.E. 100-2 at 51.) She stated that if discipline was necessary, a verbal warning was more appropriate. (Id.) No allegations of discriminatory treatment or retaliation were raised by Plaintiff, and the reprimand was ultimately upheld on review by Ron Hill, the vice president of WTH. (Id. at ¶¶ 36, 37.)

Grice soon incurred further discipline for the events occurring over the following weekend. First, she did not inform her directors that she would be more than one hour out of town in Memphis on Saturday, February 13 as was required of her. (Id. at ¶¶ 42, 43.) Next, on the following day, there was inadequate coverage on C8—a responsibility of hers. (Id. at ¶¶ 44, 45.) As a result of the inadequate staffing, Plaintiff was contacted by the staffing office numerous times by home phone, cell phone, and pager to come into work that morning, but she failed to respond as required until later that afternoon. (Id. at ¶¶ 47–48, 53.) At this time it was also discovered that Grice's home phone number with the staffing office was incorrect—a violation of WTH policy. (Id. at ¶¶ 49, 50.) Because Grice could not be contacted, Roberts and Lewis had to report to work to cover for the inadequate staffing on C8. (Id. at ¶ 51.) These directors had never previously reported to work to cover for the inadequate staffing or unavailability of the other clinical managers under their supervision. (Id. at ¶ 52.) Finally, Grice violated hospital policy by clocking in late when she came to work on Monday, February 15, 2010. (Id. at ¶ 54.) However, her twelve minutes tardiness was the only time she was late while Roberts and Lewis were her supervisors. (D.E. 118 at ¶ 21.)

That same day, Roberts and Lewis met with Grice regarding her unavailability over the weekend and ultimately gave her a formal corrective action plan two days later. (D.E. 100-2 at ¶¶ 55, 56.) The plan outlined the required corrective action for her performance and behavior and stated the minimum expectations and standards. (D.E. 101 at 14.) It also established performance review periods at thirty, sixty, and ninety days from its issuance. (Id.) On March 15, the directors met with Grice to conduct the initial performance review. (Id. at ¶ 60.) In that meeting, Roberts and Lewis raised issues about Plaintiff having unfounded concerns with a new employee and not

having enough time to orient a new intern, but otherwise stated that there had been no further incidents. (D.E. 101 at 15–16.)

On March 24, Roberts instructed Grice that she may have to leave at about "noon or so" and be prepared to come back that evening if she could not find enough coverage for the night shift, and that Plaintiff should advise her what she arranged. (D.E. 119-5 at 3.) Grice responded that she had contacted the staffing office and would know by 1:00 whether she should go home or not. (Id.) Plaintiff subsequently stayed past noon, and Roberts and Lewis considered this a failure to follow a direct order. (D.E. 100-2 at ¶ 63.) They met with Grice the following day to discuss the perceived failure and told her she was not meeting expectations and should begin looking for other positions. (Id. at ¶ 64.) Sometime after this meeting, Plaintiff discussed her treatment by Roberts and Lewis with Ron Hill, but did not claim that their actions were due to her race. (Id. at ¶ 68.)

Plaintiff's directors observed additional problems with her performance prior to the sixty day review on April 15. At some point in April, it was discovered that Grice was unaware, but should have been, that LPNs (Licensed Practical Nurses) could not perform full patient histories and had been allowing them to do so in violation of hospital policy and state law. (Id. at ¶ 69.) It was further evident, however, that Roberts, who stopped serving as Grice's supervisor around this time, was herself unaware of this limitation. (D.E. 118 at ¶¶ 13, 14.) In the review meeting, Grice was asked to conduct staff in-services regarding LPN duties, but did not do so by April 30, as requested. (D.E. 100-2 at ¶ 74.) Grice was also told to begin working 2–10 p.m. at least once a week to have more visibility with the night shift staff and to make sure it was covered, but she did not do this every week. (Id. at ¶ 84.) Finally, she was instructed to develop a plan for

transferring patients off the unit to the inpatient unit in a timely manner. (Id. at ¶ 86.) However, Plaintiff never provided the requested plan. (Id. at ¶ 93.)

On April 25, Renee Peebles, a white female, was promoted to director of C8—the position vacated by Richard Wood. (Id. at ¶ 75.) Plaintiff was again prescreened for the position by Debbie Harris, but this time was removed from consideration due to the active discipline in her file. (Id. at ¶ 79.) WTH policy stated that applicants for a job posting must meet the minimum experience requirement for the considered position, which in the case of the nursing director position, required applicants to have at least three years of clinical nursing experience. (D.E. 108-1 at ¶¶ 61, 62.) At the time Peebles was promoted, she did not have clinical nursing experience and had been working on C8 as a registered nurse under Plaintiff's supervision. (Id. at ¶¶ 63, 64; D.E. 118 at ¶ 15.) After Peebles' promotion, Lewis continued to assist on C8 as an interim director while Peebles was transitioning. (Id. at 80.)

On May 7, Grice informed Peebles that she was coming in to perform the previously requested in-services and would not be clocking in. (D.E. 108-1 at ¶ 36.) Peebles did not relay this conversation to Lewis and allowed Grice to work that day without clocking in which constituted a violation of WTH policy and state law on both of their parts. (D.E. 100-2 at ¶ 82; D.E. 108-1 at ¶¶ 36–38.)   On May 10, Plaintiff made a scheduling error when she failed to properly handle an employee FMLA call in (D.E. 100-2 at ¶ 89.) The next day, while Grice was not working, an inpatient admittee was left on C8 at midnight in violation of licensing standards. (Id. at 88.) Also, at some point around this time, there was a verbal altercation between two staff members to which Grice responded to inappropriately and failed to inform her directors. (Id. at ¶ 92.)

On May 12, Lewis and Peebles met with Grice and expressed dissatisfaction about her performance as clinical manager of C8. (Id. at ¶ 95.) Soon thereafter, Mollie Taylor, the Executive Director of the Progressive and Intensive Care Units, Harris, and Lewis conferred and, citing continued performance issues, recommended to Albright that Plaintiff be demoted. (Id. at ¶ 96.) After consulting with Ron Hill, the vice president, Albright made the decision to demote Grice. (Id. at ¶ 97.) On May 17, Taylor, Harris, and Lewis met with Grice to inform her of the decision. (Id. at ¶ 98.) Plaintiff filed a formal complaint in response, stating that she had been unfairly treated and subjected to a hostile environment by Roberts and Lewis throughout their tenure as interim directors. (D.E. 108-1 at ¶ 30; D.E. 101 at 26–30.) Grice did not make any allegations of racial discrimination in this complaint or at any other time prior to her demotion. (D.E. 100-2 at ¶ 106.) Brad Hatch, a white male, was subsequently promoted to the C8 clinical manager position on July 12. (Id. at ¶ 100; D.E. 118 at ¶ 16.) Grice ultimately resigned from her employment with WTH effective July 27, 2010, describing as reasons the "hurt and devastation" she endured under Lewis and Robert's supervision and her inability to afford working for less pay following her demotion. (D.E. 112 at 9.)

## III. ANALYSIS

### A. Disparate Treatment Claims

Plaintiff argues that she was unlawfully treated by Defendant through its supervisory employees or agents on the basis of her race in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. (D.E. 64.) Specifically, she claimed that

> [t]he unlawful practices include, but are not limited to[,] discrimination against
> the Plaintiff on the basis of race in the form of demoting Plaintiff; placing

Plaintiff in false and negative light before the public and Defendant [h]ospital management and employees; questioning the Plaintiff's credibility in a manner as to discredit her and ruin her potential for promotion . . .; non-selection for the position of nurse director vacated by Richard Wood; . . . unwarranted evaluations; improperly requiring Plaintiff to find a place to work without offering assistance; failing to provide perceived necessary remedial training and coaching; and verbal comments about Plaintiff made by management employees to Plaintiff and to others . . . .

(D.E. 64 at 11–12.) This shotgun approach causes difficulty in identifying the specific claims she is making under the umbrella of racially disparate treatment. As Defendant points out, Plaintiff appears to be casting a wide net to include assertions for discriminatory discipline, demotion, and failure to promote. (D.E. 100-1 at 3.) While there is a different set of elements making up the prima facie case for each allegation, they are all analyzed for purposes of this Rule 56 motion under the same established Title VII standard. Thus, it is first necessary to lay out the overall Title VII framework and then assess Plaintiff's specific claims in turn.

1. *Title VII Burden-Shifting Analysis*

Title VII proscribes discrimination "against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "At the summary-judgment stage, a plaintiff must adduce either direct or circumstantial evidence to prevail on a Title VII race-discrimination claim." Upshaw v. Ford Motor Co., 576 F.3d 576, 584 (6th Cir. 2009) (citing DiCarlo v. Potter, 358 F.3d 408, 414 (6th Cir. 2004)). When, such as here, a plaintiff offers no direct evidence of discrimination, she must proceed under the burden-shifting framework first established by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and later modified in Tex. Dep't of Cmty.

Affairs v. Burdine, 450 U.S. 248, 252–53, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). White v. Baxter Healthcare Corp., 533 F.3d 381, 391 (6th Cir. 2008); see, e.g., Weigel v. Baptist Hosp. of E. Tenn., 302 F.3d 367, 377–78 (6th Cir. 2002).

> The Sixth Circuit has summarized this tripartite burden shifting test as follows:

> The burden is first on the plaintiff to demonstrate a prima facie case of race discrimination; it then shifts to the employer to offer a legitimate, non-discriminatory explanation for its actions; finally, the burden shifts back to the plaintiff to show pretext—i.e. that the employer's explanation was fabricated to conceal an illegal motive.

Chen v. Dow Chem. Co., 580 F.3d 394, 400 (6th Cir. 2009) (citing Clay v. United Parcel Serv., Inc., 501 F.3d 695, 703 (6th Cir. 2007)). The defendant's burden is "merely a burden of production, not of persuasion, and it does not involve a credibility assessment." Upshaw, 576 F.3d at 586; see McNeail-Tunstall v. Marsh USA, 307 F. Supp. 2d 955, 967 (W.D. Tenn. 2004) (same); see also Reeves v. Sanderson Plumbing Prods, Inc., 530 U.S. 133, 142, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000). "Indeed, the employer's burden is light: it is 'satisfied if he simply explains what he has done or produces evidence of legitimate nondiscriminatory reasons.'" Brown v. Ohio State Univ., 616 F. Supp. 2d 740 (S.D. Ohio 2009) (quoting Bd. of Trs. v. Sweeney, 439 U.S. 24, 25 n,2, 99 S. Ct. 295, 58 L. Ed. 2d 216 (1978)), aff'd, 385 F. App'x 486 (6th Cir. 2010).

If the defendant meets its burden, "a plaintiff can show pretext in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." Chen, 580 F.3d at 400 (advising courts to avoid formalism in the application of this test and to not "lose sight of the fact that at bottom the question is always whether the employer

11

made up its stated reason to conceal intentional discrimination") (citing <u>Hedrick v. W. Reserve Care Sys.</u>, 355 F.3d 444, 460 (6th Cir. 2004)).

To ultimately prevail, the plaintiff must prove that the "real reason" for the employer's action was discrimination. <u>Griffin v. Finkbeiner</u>, 689 F.3d 584, 594 (6th Cir. 2012) (citing <u>Virts v. Consol. Freightways Corp. of Del.</u>, 285 F.3d 508, 522 (6th Cir. 2002)). The employee, however, is not required to carry this ultimate burden at the summary judgment stage. <u>Id.</u> Instead, she "need only produce enough evidence to support a prima facie case and to rebut, but not to disprove, the defendant's proffered rational." <u>Id.</u> at 593 (quoting <u>Blair v. Henry Filters, Inc.</u>, 505 F.3d 517, 532 (6th Cir. 2007), <u>overruled on other grounds by</u> <u>Gross v. FBL Fin. Servs., Inc.</u>, 557 U.S. 167, 129 S. Ct. 2343, 174 L. Ed. 2d 119 (2009)). Nonetheless, "summary judgment is proper if, based on the evidence presented, a jury could not reasonably doubt the employer's explanation." <u>Chen</u>, 580 F.3d at 400 n.4 (citing <u>Reeves</u>, 530 U.S. at 148, 120 S. Ct. 2097).

2. *Discriminatory Discipline*

A plaintiff establishes a prima facie case of discriminatory discipline by showing: (1) "membership in the protected class"; (2) that she "suffered from an adverse action"; (3) that she was "qualified for the position"; and (4) that she was "treated differently from similarly situated members of the unprotected class." <u>Chattman v. Toho Tenax Am., Inc.</u>, 686 F.3d 339, 347 (6th Cir. 2012) (quoting <u>Alexander v. Local 496, Laborers' Int'l Union</u>, 177 F.3d 394, 402–05 (6th Cir. 1999)). It is undisputed that Grice, an African American, is a member of a protected class, that she suffered from an adverse employment action, and that she was qualified for her position. With only the fourth element in contention, Grice bears the burden of producing evidence "that

white employees, 'similar in all of the relevant aspects' of employment, were not similarly disciplined." Id. (quoting Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir. 1998)).[1] Her burden is not to "demonstrate exact correlation" with the identified employees, but to equate the relevant aspects of employment dictated by "the circumstances of the individual case." Id. (citation and internal quotation marks omitted).

The relevant aspects for comparison can include similarities in "job title, responsibilities, experience, and work record." Hatchett v. Health Care & Retirement Corp. of Am., 186 F. App'x 543, 548 (6th Cir. 2006) (citing Leadbetter v. Gilley, 385 F.3d 683, 691 (6th Cir. 2004)). "In the disciplinary context, the plaintiff and her proposed comparator must have 'engaged in acts of comparable seriousness.'" Jones v. Jackson-Madison Cnty. Gen. Hosp. Dist., No. 11-1286, 2013 WL 3336724, at *4 (W.D. Tenn. Jan. 2, 2013) (quoting Dickens v. Interstate Brands Corp., 384 F. App'x 465, 468 (6th Cir. 2010)). The Sixth Circuit has explained that

> [t]o make this assessment, we have looked to certain factors, such as whether the individuals have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it. However, when such factors are not relevant, we need not consider them. Rather, to determine whether two individuals are similarly situated with regard to discipline, we make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the proposed comparable employee.

Dickens, 384 F. App'x at 468 (internal citations and quotation marks omitted).

Grice asserts that she was similarly situated to but treated differently from Richard Wood, Kim Bailey Roberts, Renee Peebles, Anita Moss, and Sally Burrow. (D.E. 107 at 8; D.E. 107-1

---

[1] Defendant cites Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992) in arguing that Grice must show that any comparable employees are "similarly-situated in *all* respects." (D.E. 100-1 at 7) (emphasis added). However, the Sixth Circuit has held that requiring a plaintiff to show similarity in "every single aspect of employment" is overly restrictive, and instead, she must only establish similarity in all "relevant aspects." See Ercegovich, 154 F.3d at 352.

at ¶ 107)). Defendant agrees that she was similarly situated, at least in job status, to Moss and Burrow, the other clinical nurse managers under Lewis and Roberts' supervision. (D.E. 123 at 1–4.) Defendant rejects, however, that she was comparable at all to the other identified persons. (Id.) Wood, Roberts, and Peebles each served as Plaintiff's immediate supervisor at some point during her tenure at WTH, but none were fellow clinical nurse managers. Plaintiff argues that the clinical nurse manager and nurse director positions had "substantially similar duties" and "the only difference was the nurse director had additional responsibilities." (D.E. 107 at 5.) The Court does not agree. While the two positions do share some common aspects (as many positions within an organization necessarily would), Grice cannot overcome the fact that directors are *supervisors* of clinical nurses and are tasked with more big-picture, process-oriented goals, while the clinical nurses are primarily "responsible for routine daily operations . . . [u]nder the direction of the Director."[2] See Perkins v. Harvey, 368 F. App'x 640, 645 (6th Cir. 2010) ("a disparate treatment plaintiff cannot treat relevant points of comparison as a type of balancing test").

Regardless, even if the court allows comparison to these employees by perhaps considering Albright a common supervisor, Plaintiff still fails to produce any evidence showing they engaged in "acts of comparable seriousness." Dickens, 384 F. App'x at 468; see also Bobo v. United Parcel Serv., Inc., 665 F.3d 741, 751 (6th Cir. 2012) (courts should not rigidly apply the "same supervisor" criterium but should look at the relevant factors presented by the

---

[2] A clinical manager is "[r]esponsible for assessing, planning, implementing, and evaluating the nursing care administered to meet patient care needs." (D.E. 112 at 3.) She is also, "[u]nder the direction of the Director, responsible for daily operations of [her] assigned unit." (Id.) A director is "[r]esponsible for operational management of [her] assigned unit, supervision of assigned unit personnel, and utilization of the nursing process and age specific criteria in delivery of patient care, i.e., Assessment, Planning, Implementation and Evaluation of outcome." (D.E. 95-2 at 9.) She must "[g]enerally make things better everyday in each area[] of her listed responsibilities." (Id.)

situation); <u>McMillan v. Castro</u>, 405 F.3d 405, 414 (6th Cir. 2005) (employees sharing the same overall, rather than immediate, supervisor may still be similarly situated).[3] Plaintiff's comparisons amount to nothing more than conclusory allegations—not credible evidence raising a fact question for a jury. <u>See</u> <u>Blackburn v. Shelby Cnty.</u>, 770 F. Supp. 2d 896, 920 (W.D. Tenn. 2011) ("Without evidence specifying similarly situated [persons] that received more favorable treatment, Plaintiff's conclusory statements provide no credible and specific evidence of disparate treatment on these claims."); <u>see also</u> <u>Parries v. Makino, Inc.</u>, 148 F. App'x 291, 296 (6th Cir. 2005) (even if a plaintiff can show they were subjected to "more intense scrutiny by his employers than were other, non-minority workers . . . the same evidence does not establish legally disparate treatment").

Likewise, Plaintiff has not established that Burrows and Moss, two white female nurse clinical managers who are clearly comparable to herself, engaged in similar conduct. Grice provides absolutely no evidence that these clinical managers ever miscommunicated or misrepresented facts to the directors, made scheduling errors, were unavailable over a weekend, or neglected to report an out of town trip. If there were such blemishes on either person's record, Grice failed to identify them. <u>See</u> <u>Dickens</u>, 384 F. App'x at 469 (a plaintiff must plead "facts that a rational finder of fact could use to infer that [her] alleged comparators are similarly situated") She simply cannot satisfy her burden of production with bare, subjective beliefs and feelings of differential treatment. <u>See</u> <u>Adams v. Tenn. Dep't of Fin. & Admin.</u>, 179 F. App'x 266, 273 (6th Cir. 2006) (where the "record is devoid of *any* evidence" of similar conduct, the plaintiff "has

---

[3] Grice attempts a specific comparison only to Wood and Peebles. In comparison to Wood, she emphasizes that Albright found him to be "incompetent and aloof" at times, but fails to identify any similar behavior for which Wood was not disciplined. (D.E. 107 at 6.). The comparison to Peebles is discussed fully in the demotion context. <u>See</u> <u>infra</u> pp. 18–19.

failed to establish a *prima facie* case of race discrimination"); <u>Parries</u>, 148 F. App'x at 297 ("To make out a case of disparate treatment, the plaintiff must produce *specific facts* showing [she] and the non-minority employee engaged in similar conduct.").[4]

    3. *Discriminatory Demotion*

A plaintiff creates a prima facie case of discriminatory demotion under Title VII by proving that (1) she is a member of a protected class; (2) she was qualified for the position; (3) she was demoted; and (4) was either replaced by or treated differently from a similarly situated person outside of the protected class. <u>Bush v. Am. Honda Motor Co.</u>, 227 F. Supp. 2d 780, 789 (S.D. Ohio 2002); <u>see</u> <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 506, 113 S. Ct. 2742, 2747, 125 L. Ed. 2d 407 (1993). Defendant does not dispute that Plaintiff has established a prima facie case for purposes of summary judgment. (D.E. 100-1.) Thus, the burden of production shifts to WTH "to offer a legitimate, non-discriminatory explanation for its actions." <u>Chen</u>, 580 F.3d at 400.

Defendant presents a number of nondiscriminatory reasons in the record for why Plaintiff was demoted:

> Plaintiff's staff called in, in violation of the inclement weather policy, during the weekend of February 29, 2010. Plaintiff, a management leader, failed to stay at work to assist. She went out of town without telling management and failed to answer the phone when contacted in violation of policy. She failed to successfully complete many aspects of the corrective action plan. She intentionally failed to follow directions given by her directors and made misrepresentations. She was unaware of the policy regarding LPNs and should have been as she was member

---

[4] Because Grice has not presented a prima facie case of discriminatory discipline, it is unnecessary to review the remainder of the *McDonnel Douglas* burden-shifting analysis on this claim. <u>See, e.g.,</u> <u>Perkins</u>, 368 F. App'x at 645; <u>Singfield v. Akron Metro. Hous. Auth.</u>, 389 F.3d 555, 562 (6th Cir. 2004) ("By failing to satisfy the fourth element, [the plaintiff] fail[ed] to establish a prima facie case of discrimination under Title VII. Therefore, the district court properly dismissed the claim.")

of the Nursing Policy and Procedure Committee. Plaintiff reported to work late
and made scheduling errors.

(D.E. 100-1 at 11.) (citations to the record omitted) The employer has clearly met its burden of production. See Chattam, 686 F.3d at 348 (violation of company policy is a sufficient nondiscriminatory justification); see also Brown, 616 F. Supp. 2d 751 ("Reasons such as lack of leadership and management skills, the failure to accept problems within her responsibility, untimely completion of assignments, and poor communication are legitimate non-discriminatory reasons for an employee's demotion or termination."). The burden then shifts back to Grice to offer evidence of pretext that 1) these reasons had no basis in fact, (2) they did not actually motivate WTH's decision to demote her, or (3) they were insufficient to motivate the demotion. Chen, 580 F.3d at 400; see Reeves, 530 U.S. at 142, 120 S. Ct. 2097.

Having established a prima facie case, Grice need only rebut, not disprove, WTH's proffered reasoning in order to survive summary judgment. See Blair, 505 F.3d at 532. However,

> summary judgment for the defendant may be appropriate even after the plaintiff
> has presented evidence that the defendant's proffered reason for the [adverse
> action] was false "if the record conclusively revealed some other,
> nondiscriminatory reason for the employer's decision, or if the plaintiff created
> only a weak issue of fact as to whether the employer's reason was untrue and
> there was abundant and uncontroverted independent evidence that no
> discrimination had occurred."

Carter v. Toyota Tsusho Am., Inc., __ F. App'x __, 2013 WL 3306336, at *8 (6th Cir. July 2, 2013) (quoting Reeves, 530 U.S. at 148, 120 S. Ct. 2097). The only argument which Plaintiff gives to show pretext in regard to her demotion is that "Lewis, Bailey and Albright did not apply the progressive discipline policy to the Plaintiff but did apply this policy to Renee Peebles, after

she became director of C8 and to Mr. Wood when he served as director of C8."[5] (D.E. 107 at 4.) She makes this assertion without any citation to the record, and the Court, on its own effort, cannot uncover support for Grice's conclusory statement. See Hullom v. City of Jackson, Tenn., No. 1:08-cv-01227, 2010 WL 1068232, at *5 (W.D. Tenn. Mar. 24, 2010) ("Essentially Plaintiff's argument is that because a demotion was not a fair punishment, race discrimination must have been the true motivation behind it. This assertion must fail.")

As to Peebles, Plaintiff appears to argue that the comparator received different treatment, i.e. was not demoted or disciplined, after improperly allowing Plaintiff to come to work without clocking in. (D.E. 100-2 at ¶ 82; D.E. 108-1 at ¶¶ 36–38.) Although Peebles was not disciplined for this incident (she had just begun orientation in the new position), she had previously been given a verbal warning for calling in during the snowstorm that occurred on January 29, 2013. (D.E. 111 at 6.) The progressive discipline policy to which Grice is referring establishes a "method for supervisors to follow when administering discipline to an employee who has violated a company policy or is not performing up to the required standards to perform his/her occupation." (D.E. 109 at 8.) This policy does not establish mandatory guidelines, but instead reserves to WTH "the right to impose immediate disciplinary action up to and including termination when WTH deems such action appropriate." (Id.) The general procedure for

---

[5] Plaintiff is perhaps also asserting pretext in her demotion when stating the following: "Lewis and Bailey had made their minds up on March 25, 2010 that Plaintiff would be removed from her position [] and told her to find another position. In April[,] after Brad Hatch did not get the director['s] position, Lewis told Hatch that a [clinical] position would be coming open soon." (D.E. 107 at 4.) (citations omitted) Lewis stated that she told Hatch this because another clinical nurse was set to retire in 2012. (D.E. 100-2 at 283.) At first glance, this could be construed as an ill-motivated and premeditated decision to demote Plaintiff. However, the fact that the directors made it explicitly clear to Plaintiff that she would be removed from her position one way or another, completely belies any apparent assertion that the directors were secretly plotting her removal to further some discriminatory purpose. Finally, Grice makes no claims of differential treatment from Wood aside from those previously discussed in the disciplinary context. See supra n.3.

applying discipline is to begin with a verbal reprimand, and progress to a written warning, suspension, and termination, as necessary. (Id.) Here, Plaintiff was only demoted after receiving verbal and written warnings and having numerous performance meetings over a four-month period. WTH's actions do not facially deviate from the disciplinary policy and Grice does not produce any evidence which would allow a jury to deduce as much. Because Plaintiff's assertions involving her demotion fail to create even a "weak issue of fact," Defendant is entitled to summary judgment on this issue. See Reeves, 530 U.S. at 148, 120 S. Ct. 2097; Hullom, 2010 WL 1068232, at *5 ("Plaintiff has submitted nothing to substantiate his claim that he was a victim of race discrimination. Absent such evidence, Plaintiff is nothing more than a 'victim' of an employment action with which he disagrees, a situation that is insufficient to form the basis of a Title VII claim.").

4. *Failure to Promote*

To establish a prima facie case of race discrimination from a failure to promote, Grice must show that: "(1) she is a member of a protected class; (2) she was qualified for the promotion; (3) she was 'considered for and denied the promotion'; and (4) 'other employees of similar qualification who were not members of the protected class received promotions.'" Upshaw, 576 F.3d at 585 (quoting Grizzell v. City of Columbus Div. of Police, 416 F.3d 711, 719 (6th Cir. 2006)). Plaintiff asserted in her response that she has "shown that she was the most qualified for the postion [sic] of nurse director and that Peebles did not meet the minimum qualification. There is a strong question of pretext in this record." (D.E. 107 at 8.) WTH concedes that Grice met the first, third, and fourth prongs, but not the second as she was not qualified for the nurse director position. (D.E. 100-1 at 13.)

"To establish that she is qualified for the position, a Title VII plaintiff need only show that she satisfied an employer's 'objective' qualifications." Upshaw, 576 F.3d at 585 (citing Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 575–76 (6th Cir. 2003)). Specifically, a plaintiff meets her initial burden

> by presenting credible evidence that . . . her qualifications are at least equivalent to the minimum objective criteria required for employment in the relevant field. Although the specific qualifications will vary depending on the job in question, the inquiry should focus on criteria such as the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills.

Wexler, 317 F.3d at 576. Defendant states that "Plaintiff had active discipline in her file and thus, Debbie Harris, who performed the screening, determined that she was not qualified . . . based upon a neutrally applied policy."[6] (D.E. 100-1 at 13.) According to Harris, "[h]ospital policy is that employees with active discipline within the past twelve (12) months are not eligible to compete for promotions or transfers." (D.E. 100-2 at 148.) As such, Harris said she "advised Steven Albright that Plaintiff was not eligible for consideration because she had active discipline in her file." (Id.)

Prior to her promotion to the director position, Peebles was a registered nurse on C8 under Grice's supervision. (D.E. 111 at 5) She had two years of nursing experience at the time and had two verbal warnings in her file: one from September 21, 2009 for "attendance" and another from February 5, 2010 for calling in during the January 29, 2010 snowstorm. (Id. at 5–

---

[6] Grice correctly points out in her factual response that the mentioned policy does not actually state that prior or active discipline automatically excludes a person from promotional consideration. (D.E. 107-1 at 13.) The policy states that "[a]ny employee with disciplinary action on file (written warning, suspension, or probation) within twelve (12) months preceding the date of the transfer request will not be eligible for a *transfer*." (D.E. 110 at 8–11.) (emphasis added). The policy goes on to specifically delineate a "transfer" from a "promotion" or a "demotion." (Id.) However, this technical argument was disregarded by Plaintiff's counsel during Lewis' deposition when she read the policy language and then stated, "It should be a promotion too. But that's the policy you were referring to?" (D.E. 100-2 at 279.) Counsel further stated that "you know that if a person has a written reprimand in their file within a 12-month period, they're not eligible for promotion. Right?" Lewis responded, "[c]orrect." (Id. at 280.)

6.) The transfer request form used by WTH and completed by Peebles stated that the applicant "must meet the minimum requirements for this position as indicated on the job posting." (Id. at 5.) The director position requires "[p]roficiency in current practices and techniques in specific area of clinical expertise as acquired through 3–4 years of clinical experience." (D.E. 119 at 4.)

Grice presents a valid argument that WTH seemed to ignore its own policy by elevating Peebles to the director position on April 25, 2010 even though she lacked the clinical experience. Grice, herself, had over three years of clinical nursing experience at this time. (D.E. 102 at 140, 206, 280.) In Upshaw, the Sixth Circuit held that, even though it was undisputed that the plaintiff did not meet the stated criteria of having a specific rating during the relevant time period, she was nonetheless qualified for a promotion due to the employer's inconsistent application of its standards. 567 F.3d at 585. The court stated that the employer's "disparate application of the criteria implies that [it] could have relaxed intentionally its requirements" for the employees who were promoted. Id. Here, as in Upshaw, Grice has produced sufficient evidence that WTH may have been disparately applying its promotional standards, and therefore must be considered qualified for the position. As a result, the burden shifts to WTH to show a legitimate reason for failing to promote Plaintiff. See id. ("viewing the facts in the light most favorable to [the plaintiff], because [the employer] did not adhere to its stated criteria for granting . . . promotions, she has met her burden of establishing that she was qualified"); see also Burdine, 450 U.S. at 253, 101 S. Ct. 1089 (the prima facie burden "is not onerous"); Turner v. City of Akron, No. 5:06-CV-3023, 2008 WL 45376, at *10 (N.D. Ohio Jan. 2, 2008) (this is a "minimal standard" which should be considered independently of the employer's proffered reasoning).

As in the demotion context, WTH likewise meets its burden of showing a non-discriminatory reason for failing to promote Grice through her various policy violations and deficiencies previously discussed, in addition to the application of the apparent "no-promotion-with-active-discipline" policy. See Chattam, 686 F.3d at 348. Plaintiff must then produce some evidence that these reasons were merely pretext for discrimination. See Reeves, 530 U.S. at 142, 120 S. Ct. 2097. Grice insists that she was more qualified for the position, but presents no evidence upon which a reasonable jury could conclude that WTH's failure to promote her may have been racially motivated. See Adams, 179 F. App'x at 274 (a plaintiff must "produce sufficient evidence from which a jury could reasonably reject" the employer's explanation) (citing Manzer v. Diamond Shamrock Chems. Co., 29 F.3d 1078, 1083 (6th Cir. 1994), overruled on other grounds by Geiger v. Tower Auto., 579 F.3d 614 (6th Cir. 2009)). The claim of race discrimination cannot be sustained on the mere fact that she had more seniority or better subjective qualifications than Peebles. Turner, 2008 WL 45376, at *13 (courts "will not second guess business decisions made by employers, in the absence of some evidence of impermissible motives") (quoting Doan v. Seagate Tech., 82 F.3d 974, 977 (10th Cir. 1996)); Adams, 179 F. App'x at 274 (plaintiff's reliance on bald assertions and its own "depositions, affidavits, and e-mails to establish [a] perceived basis of mistreatment" is wholly inadequate.) Thus, Defendant's motion for summary judgment is GRANTED for all disparate treatment claims under Title VII.

B.  Hostile Work Environment Claim

WTH asserts that Grice's claim for hostile work environment cannot be sustained because she has failed to exhaust her administrative remedies.[7] (D.E. 100-1 at 14.) The employer argues that she did not specifically make this claim in her EEOC charge, and "[t]he discrete acts alleged in her EEOC charge could not have reasonably led the EEOC to investigate a hostile work environment." (Id. at 15.) In response, Plaintiff cites two older cases along with the conclusory remark that "it is clear that Plaintiff exhausted a hostile environment claim and that Defendant should not be granted summary judgment." (D.E. 107 at 9.) Despite Grice's cursory argument, the Court agrees that she exhausted her administrative remedies because she did specifically allege a hostile work environment in her EEOC filings. While Defendant focused on Grice's EEOC charge form, which obviously did not include the issue, it did not take into account her EEOC intake questionnaire accompanying the charge form.[8] (See D.E. 118-1 at 2–5.) Question five asks: "What happened to you that you believe was discriminatory? Include the date(s) of harm, the action(s), and the name(s) and title(s) of the person(s) who you believe discriminated against you." (D.E. 118-1 at 3.) In response, Grice listed Steven Albright, Kim

---

[7] A plaintiff cannot sue on Title VII claims unless they were previously included in her EEOC charge. Younis v. Pinnacle Airlines, Inc., 610 F.3d 359, 361–62 (6th Cir. 2010); see 42 U.S.C. § 2000e-5(f)(1); Alexander v. Gardner-Denver Co., 415 U.S. 36, 47, 94 S. Ct. 1011, 39 L. Ed. 2d 147 (1974). Claims considered to have been included are those specifically alleged and "those within the scope of the EEOC investigation reasonably expected to grow out of the charge of discrimination." Scott v. Eastman Chem. Co., 275 F. App'x 466, 471 (6th Cir. 2008); see also Baltimore v. City of Franklin, No. 3:06-0578, 2007 WL 2123906, at *3 (M.D. Tenn. July 20, 2007) (quoting Strouss v. Mich. Dept. of Corr., 250 F.3d 336, 342 (6th Cir. 2001)) ("It is well settled that federal courts do not have subject matter jurisdiction to hear Title VII claims unless the claimant explicitly files the claim in an EEOC charge or the claim can be reasonably expected to grow out of the EEOC charge.") Considering that most EEOC charges are filed pro se, courts liberally interpret the claims made and do not preclude a plaintiff from suing "where facts related with respect to the charged claim would prompt the EEOC to investigate a different, uncharged claim." Brown v. City of Cleveland, 294 F. App'x 226, 234 (6th Cir. 2008) (quoting Davis v. Sodexho, Cumberland Coll. Cafeteria, 157 F.3d 460, 463 (6th Cir. 1998)).

[8] The Supreme Court has held that at least in some instances, this intake questionnaire alone can constitute a "charge" sufficient for Title VII jurisdiction. Fed. Express Corp. v. Holowecki, 552 U.S. 389, 405–06, 128 S. Ct. 1147, 170 L. Ed. 2d 10 (2008). Certainly, when simultaneously submitted with a Form 5 (formal charge), allegations made in the questionnaire are properly raised before the EEOC. See Williams v. CSX Transp. Co. 643 F.3d 502, 510 (6th Cir. 2011).

Bailey Roberts, and Deborah Lewis as the persons responsible for "[h]arrassment, hostile environment created [sic]" starting on February 1, 2010. (D.E. 118-1 at 3.) Thus, a hostile work environment claim was "within the scope of the EEOC investigation" and this Court has subject matter jurisdiction over that claim. <u>Scott</u>, 275 F. App'x at 471; <u>see</u> <u>Strouss</u>, 250 F.3d at 342.

To establish a prima facie case of a racially hostile work environment, a plaintiff must show "1) that [she] is a member of a protected class; 2) that [she] was subjected to unwelcome racial harassment; 3) that the harassment was based on race; 4) that the harassment had the effect of unreasonably interfering with [her] work performance by creating an intimidating, hostile, or offensive work environment; and 5) the existence of employer liability." <u>Newman v. Fed. Express Corp.</u>, 266 F.3d 401, 405 (6th Cir. 2001); <u>see</u> <u>Donald v. Buckman Labs., Inc.</u>, __ F. App'x __, 2013 WL 2397776, at *5 (6th Cir. June 4, 2013). Neither party specifically addressed these elements. Nevertheless, the Court finds that Grice also failed to prove anything beyond the first element—that she is a member of a protected class.

As discussed with the previous claims, there is a complete dearth of evidence in the record that Grice's race had anything to do with the actions taken against her while employed with Defendant. Prior to filing the EEOC charge, Grice never raised any issue about her race or the race of her supervisors. <u>See</u> <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21–22, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993) ("[I]f the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.") She further failed to point to any evidence in the record, beyond her own conclusory allegations and assumptions, that she was "subjected to unwelcome racial harassment." <u>See, e.g.</u>, <u>Barrett v. Whirlpool Corp.</u>, 556 F.3d 502, 515 (6th Cir. 2009) (fact issue

for jury where plaintiff was subjected to numerous racially charged comments); <u>Armstrong v. Whirlpool</u>, 363 F. App'x 317, 324–25 (6th Cir. 2010) (same). Even if Plaintiff could somehow evince a potential connection between race and the actions of her supervisors, the evidence would still fall woefully short of allowing any reasonable jury to conclude that WTH was "permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." <u>Barret</u>, 556 F.3d at 515 (quoting <u>Harris</u>, 510 U.S. at 21, 114 S. Ct. 367); <u>see Faragher v. City of Boca Raton</u>, 524 U.S. 775, 788, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998) ("simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment") (internal citations and quotation marks omitted). Therefore, Defendant's motion for summary judgment is GRANTED on Plaintiff's hostile work environment claims.

## C. Retaliation Claim

Under 42 U.S.C. § 2000e-3(a), it is "an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing." This creates a claim for retaliation, which a plaintiff can establish by showing that: "(1) she engaged in protected activity; (2) [the employer] knew that she engaged in the protected activity; (3) [the employer] subsequently took an adverse employment action against the [employee]; and (4) the adverse action was causally related to the protected activity." <u>Ladd v. Grand Trunk W. R.R., Inc.</u> 552 F.3d 495, 502 (6th Cir. 2009) (citing <u>Mickey v. Zeidler Tool & Die Co.</u>, 516 F.3d 516, 523 (6th Cir. 2008)). As with disparate treatment claims, retaliation claims based on circumstantial

evidence are analyzed under the *McDonnel Douglas* burden-shifting framework. See Mickey, 516 F.3d at 523. Similarly, "[t]he burden of establishing a prima facie case in a retaliation action is not onerous, but one easily met." Id. (quoting Nguyen v. City of Cleveland, 229 F.3d 559, 563 (6th Cir. 2000))

Defendant argues that Grice has not met her burden because she has not shown that she engaged in any protected activity under Title VII. (D.E. 100-1 at 19.) Plaintiff asserts that the two formal grievances she filed in February and May 2010 in response to her discipline regarding the miscommunication incident and eventual demotion, respectively, constituted protected activity for which she suffered retaliation. (D.E. 64 at 14–15.) A court in this district recently analyzed what qualifies as protected activity:

> "Although filing an official complaint with an employer may constitute statutorily protected activity under Title VII, the complaint must indicate that discrimination occurred because of sex, race, national origin, or some other protected class." Tomanovich v. City of Indianapolis, 457 F.3d 656, 663 (7th Cir. 2006) (citations omitted). "Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient." Id.; Tropp v. Ingalls Mem. Hosp., No. 06-C-414, 2007 WL 869555, at *15 (N.D. Ill. Mar. 21, 2007) ("[S]tatements that complain of discrimination generally, without the context of age, cannot constitute a protected activity."); see also Offutt v. Warren County Reg'l Jail, 109 Fed. App'x. 740, 743 (6th Cir. 2004) (finding no protected activity under Title VII where employee "never indicated that her opposition was based on Title VII"); Mikols v. Reed City Power Line Supply Co., No. 1:07-CV-84, 2008 WL 2696915, at *6 (W.D. Mich. July 1, 2008) (finding no protected activity where employee's general comments about "treating people equitably" did not "inform the employer that gender discrimination" was employee's concern); Johnson v. Potter, No. 07-2665-STA-dkv, 2009 WL 368366, at *9 (W.D. Tenn. Feb. 12, 2009) (finding no protected activity where "there is no evidence in the record to reflect that [employee] complained to [employer] about unlawful discrimination on the basis of a protected characteristic").

Longs v. Ford Motor Co., 647 F. Supp. 2d 919, 932–33 (W.D. Tenn. 2009).

Plaintiff has clearly failed to produce any evidence that she engaged in any protected activity under Title VII. She first asserts that her formal complaint filed on February 17, 2010 in response to her written reprimand given February 10, was protected activity. (D.E. 64 at ¶ 49.) However, nowhere in this complaint did Plaintiff mention any discriminatory action on the basis of race or other protected class. Grice explained her version of the incidents leading to the discipline and described that she had "been forced to walk on 'egg shells'" and was accused of lying, but made no allegation that would involve Title VII. (D.E. 101 at 7–11.) In the May 19, 2010 grievance filed in response to Grice's demotion, she stated that she experienced "wrongful treatment," and felt that she was working in a "hostile situation/environment," but again made no reference to retaliation because of her race. (D.E. 101 at 26–30.) Like the plaintiff in Longs, Grice's "general complaints of discrimination, which neither referred to a protected class nor provided facts sufficient to create that inference, are 'insufficient to constitute opposition to an unlawful employment practice.'" Longs, 647 F. Supp. 2d at 933 (quoting Booker v. Brown & Williamson Tobacco Co., 879 F.2d 1304, 1313 (6th Cir. 1989)). Thus, Defendant's motion for summary judgment is GRANTED as to Plaintiff's retaliation claim.

D.   THRA Claim

In addition to her claims under Title VII, Plaintiff asserted violations of the Tennessee Human Rights Act (the "THRA"), which prohibits employment discrimination on the basis of "race, creed, color, religion, sex, age or national origin." Tenn. Code Ann. § 4-21-401. Defendant urges the Court to exercise its discretionary power to decline supplemental jurisdiction over this state law claim pursuant to 28 U.S.C. § 1367(c)(4). However, reaching this question is unnecessary. This Court is precluded from asserting supplemental jurisdiction

because WTH enjoys sovereign immunity from suit for THRA claims in federal court. <u>See</u> <u>Fitten v. Chattanooga–Hamilton Cnty. Hosp. Auth.</u>, No. 1:01–CV–152, 2002 WL 32059748, at *5 (E.D. Tenn. Oct. 21, 2002) ("because of the Hospital Authority's sovereign immunity, the Court does not have supplemental jurisdiction of [the employee's] claims pursuant to the THRA").

The Sixth Circuit has explicitly held that Defendant is a governmental entity. <u>See</u> <u>Jackson, Tenn. Hosp. Co. v. W. Tenn. Healthcare, Inc.</u>, 414 F.3d 608, 609–10 (6th Cir. 2005) ("the Jackson-Madison County General Hospital District . . . is a political subdivision of the state of Tennessee"). Furthermore, federal courts in Tennessee have consistently held that suits against state entities brought by individuals under the THRA are disallowed by the Eleventh Amendment. <u>See</u> <u>Jones v. Sw. Tenn. Cmty. Coll.</u>, No. 07-2707-STA, 2008 WL 4982742, *4 (W.D. Tenn. Nov. 18, 2008) (THRA claims against state entity are barred by the Eleventh Amendment); <u>Henderson v. Sw. Tenn. Cmty. Coll.</u>, 282 F. Supp. 2d 804, 808 (W.D. Tenn. 2003) ("Although the Legislature has waived its immunity for THRA suits in state courts, it has not done so for suits in federal courts."); <u>Fitten</u>, 2002 WL 32059748, at *4 ("the state has not consented to suit, pursuant to the THRA . . . in the federal courts."); <u>Boyd v. Tenn. State Univ.</u>, 848 F. Supp. 111, 114–15 (M.D. Tenn. 1994) ("There is no express consent by Tennessee, neither within the THRA nor elsewhere, to suit in federal court for claims under the THRA."). Thus, Plaintiff's THRA claim is DISMISSED.

## IV. CONCLUSION

For the reasons articulated herein, Defendant's motion for summary judgment (D.E. 100) is GRANTED. Plaintiff's state law claim is DISMISSED without prejudice. The Clerk is DIRECTED to enter judgment for Defendant.

IT IS SO ORDERED this 5th day of November, 2013.

s/ J. DANIEL BREEN
CHIEF UNITED STATES DISTRICT JUDGE